Parker C. J.
delivered the opinion of the Court. The plaintiffs are heirs at law of the testator and claim as such, though it is somewhat inaccurately stated in the declaration, that they became seised as heirs at law by virtue of the devise ; for the estate devised to them being the same as they would have taken by descent, the devise was inoperative. It was objected that the action was improperly brought by only two of the heirs ; but our statute of 1785, c. 62, allows some of the heirs *321 to join without the rest, in actions of waste, ejectment or other real actions, where possession of the inheritance alleged to have descended is the object of the suit; and if the action of waste is sustained, a forfeiture of the land is one of the consequences.
But it is contended, that an action of waste does not lie in this Commonwealth against tenants for life, other than those whose tenancy is in dower; and the argument is, that by the ancient common law of England, such action did not lie against such tenants, but only by St. 6 Ecliv. 1, c. 5, called the statute of Gloucester, which statute, it is said, is not in force here, never having been adopted or practised upon in our courts of law before the adoption of our constitution.
The question thus presented is one of nicety, and is the more interesting from the contradictory opinions of two of our most learned jurists, as expressed in their valuable works lately given to the profession.
Mr. Dane, in his Abridgment, in the chapter which treats of waste, considers that the statute of Marlebridge, 52 H. 3, has been adopted, whereby an action of waste is given to the reversioner, in which he may recover damages for the waste done ; but that the statute of Gloucester, according to which the place wasted is recovered, as well as treble damages, is not in force, never having been adopted. Mr. Jackson, in his treatise on real actions, considers that the consequences of waste here are the same as in England, except so far as our statute in relation to dower has made a difference ; so that it must be his opinion, that the statute of Gloucester is in force here, it being only by that statute that the place wasted is forfeited and treble damages recovered.
It is quite important, therefore, that there should be a judicial decision of this contested question, as the profession will probably be divided between these two learned jurists, and some practical inconvenience may arise from the doubtful position in which the question stands.
It seems to be clear, that before the statute of Marlebridge, that is, by the ancient common law resting in tradition, or on some more ancient statute, or on some judicial decision, tenants for life, except those in dower, by the curtesy, or by *322 guardianship, were liable to no action for waste. The reason given in the books, for the distinction between these two class es of freeholders, is, that the former hold under lease or contract, and that the party from whom he derives his estate might provide by covenant for a forfeiture, if he chose ; whereas the latter come in by law, and the law therefore provides the security for the reversioner.
This reason is applicable to the case of a lessee for life ; for it was probably not unusual for landlords to protect their estates from waste, by the introduction of covenants for reentry ; but it seems to have no force in regard to the class of tenancies for life created by will, or by deed in the settlement of estates, which probably were numerous in ancient times. But whatever may have been the reason, it seems that it was thought that some security against waste and destruction by those who enjoyed the estate without having an interest in the inheritance, was needed, a'nd therefore the statute of 52 H. 3, was passed, commonly called the statute of Marlebridge, in the year 1267; which provided, “that fermors, during their terms, shall not make waste, sale nor exile of house, woods and men, nor of any thing belonging to the tenements that they have to ferm, without special license had by writing of covenant, making mention that they may do it; which thing, if they do, and thereof be convict, they shall yield full damage, and shall be punished by amerciament grievously.”
A few years’ experience seems to have proved, that this lenient remedy against those who held freeholds or estates for years, was insufficient to secure such estates against depredations injurious to the inheritance, and probably it was seen that a remedy in damages did not afford indemnity to the reversion-er ; for many times it would happen, that he who committed or suffered the waste was unable to make the recompense. Those who enjoyed the temporary right would be eager to get the most profit at the least expense, and would be careless of the interests of those who came after them ; and for these reasons, no doubt, the statute of 6 Edw. 1, called the statute of Gloucester, was enacted, only eleven years after the statute of Marlebridge, viz. in 1278.
This statute provides, “ that a man from henceforth shall *323 have a writ of waste in the chancery against him that holdeth by law of England, or otherwise for term of life, or for term of years, or a woman in dower. And he which shall be at-tainted of waste, shall leese the thing that he hath wasted, and moreover shall recompense thrice so much as the waste shall be taxed at,” &c.
The short interval between the two statutes will warrant the belief, that the frequency of waste and destruction by those who had no interest in the inheritance, by stripping the land of its valuable timber, suffering the buildings to become dilapidated, and other injuries, had excited the public attention, and called for the interposition of parliament, lest the reversioner should come to his estate without being able to enjoy it.
That tenants for life or years should be dispunishable for waste, as they were before the statute of Marlebridge, except as before mentioned, must have been felt as wrong and unjust throughout the land ; and that statute having failed of curing the evil, the more rigorous provisions of the statute of Gloucester were found necessary, and probably produced the desired effect.
This then was the law of England as early as 1278, between three and four centuries before the settlement of this country, and it continued to be the law to the time of the emigration, and from that to the present time. It was a wholesome and necessary law, made for the preservation of estates against the depredations of those who had the power of injuring them, to the disherison of those who, being out of possession, had not the means of preventing the injury. The common law in regard to waste was thus altered and amended by statute, so that the antecedent common law was no longer in force, the same sanctions being extended towards tenants for life or years, who became such, by grant, demise or devise, as before existed in relation to such tenants as came in by act of law, such as tenants in dower and by tbe curtesy.
Before the statute of Marlebridge, a lessee or devisee for life or years was dispunishable of waste, unless care was taken in the will or lease to make him so. After that statute, such tenants were punishable, unless the will or lease expressly excused them ; upon the reasonable presumption, that no man *324 who created such an estate, could intend that it should he destroyed by him to whom the temporary enjoyment had been granted, and that nothing but an express declaration should work such a wrong.
But estates were still wasted, and the recompense or indemnity was uncertain ; perhaps the grievous amercement rendered the tenant unable to pay the reversioner. The statute of Gloucester then came, which created a forfeiture of the place wasted and of treble damages. Under this law our ancestors lived until their emigration ; their progenitors had lived under it three centuries, having had their estates protected by it, and having been subject to its penalties if they had violated it. They then came to this country, bringing with them, as all agree, the rights and privileges of Englishmen, and the common law of that country, so far as it should be found applicable to their new state and condition. They brought with them also a charter, containing power to make such new laws as their exigencies might require. They could live under the old law or make new ones. Whenever they legislated upon any subject, their own law regulated them ; when they did not legislate, the law they brought with them was the rule of conduct.
Then the question is, whether the law by which they would be governed in relation to waste committed by tenants, was the ancient common law, as it stood before the statute of Marie-bridge, or as modified by that statute, or the law which was in force in England at the time of their emigration and for centuries before ; and we think it very clear that it was the latter. It would seem exceedingly strange that their coming over to this country should operate as a repeal of either of those ancient statutes, so as to reinstate the law as it existed in the time of Henry 3, which had been abrogated three or four centuries, and was found inconvenient in the reign of that prince. And we can see no reason why they should be supposed to have adopted the statute of Marlebridge, and to have rejected the statute of Gloucester, both of which were enacted to alter and amend the common law. We think therefore, that unless our ancestors can be supposed to have settled this country, and to have held real estate without any law to protect and pre *325 serve it, the law which was in force in the country which they bad left, was their law, and remained so in regard to the descent, alienation, &c. of real property, and the remedies for injury to it, .until they saw fit to supersede it by a law of their own making. And this was the opinion of the learned jurists and judges who lived before and after the adoption of our present constitution and had occasion to study the jurisprudence of both periods.
Thus Chief Justice Dana, in the case Commonwealth v. Leach et al. 1 Mass. R. 61, says, “ the term common law ought not to be construed so strictly as is contended for. Generally when an English statute has been made in amendment of the common law of England, it is here to be considered as part of our common law.’’’’
This proposition includes statutes of that description, whether enacted before or after the settlement of the colony, and was therefore too broad as a rule of our jurisprudence. Our ancestors having brought with them an ample charter for legislation, and having in fact exercised that power as soon as they were organized as a body politic, cannot be presumed to have adopted of course all the statutes which were afterwards passed in the British parliament, which might alter or amend the common law, but only such as they practically received into their system, and which in this manner became their common law.
The distinction between the two classes ol statutes, those made before and those after the emigration, was seen and recognised by the Court in the case Commonwealth v. Knowlton, 2 Mass. R. 534. In the opinion of the Court, drawn up by Parsons C. J., though it does not bear his name, is the following sound exposition of the basis of our jurisprudence, as distinct from legislative enactments made since the present form of government has been in force.
“ Our ancestors, when they came into this new world, claimed the common law as their birthright, and brought it with them, except such parts as were judged inapplicable to their new state and condition. The common law, thus claimed, was the common law of their native country, as it was amended or altered by English statutes in force at the time of their emigration Those statutes were never reenacted in this *326 country, but were considered as incorporated into the common law.[1] Some few other English statutes, passed since the emigration, were adopted by our courts, and now have the authority of law, derived from long practice. To these may be added some ancient usages, originating probably from laws passed by the legislature of the colony of the Massachusetts Bay, which were annulled by the repeal of the first charter, and from the former practice of the colonial courts,-accommodated to the habits and manners of the people.”
“ So much therefore of the common law of England as our ancestors brought with them, and of the statutes then in force, amending or altering it; such of the more recent statutes as have been since adopted in practice; and the ancient usages aforesaid, may be considered as forming the body of the common law of Massachusetts, which has submitted to some altera tians by the acts of the provincial and State legislatures, and by the provisions of our constitution.”
If the foregoing be a true enumeration of the materials which compose the common law by which our ancestors, under their colonial institutions, were governed, then it is very clear that the action of waste was the same and had the same consesequences with them, as it had in England under the statute of Gloucester, viz. forfeiture of the place wasted and treble damages. Nor does it in any way affect the argument, that no instance can be produced of such an action from the records ; for it is known that the colonial records were but imperfectly preserved, and it may be that no occasion for the use of that action occurred in those times of simplicity and of crude administration of law, especially in regard to real property, which had hardly .begun to be of value. Without doubt many principles of the common law have been brought into view and applied in later times, which, in the early period of our history, there was no occasion to use, as well as many forms of action, which, though now necessary, were then of no practical value. But the common law existing then as it does now, its copious *327 fountain was resorted to for relief, as the exigencies of the rapidly increasing community required.
We admit the authority of the colonial legislature, while its charter continued, to have substituted any other remedy for waste than that which existed in England, or even to have made it dispunishable, as it was in regard to lessees for life or years before the statute of Marlebridge ; but if they did not choose to legislate upon the subject, the common law, as above described, remained in force. We do not find that they passed any law upon the subject, except in relation to tenants in dower, and the brief and imperfect legislation upon that subject, upon a familiar principle of legal reasoning, gives strength to the position, that in regard to waste committed by other tenants for life, or lessees for years, they intended to leave the law as n was ; expressio unius, &c.
But even in regard to tenants in dower we hardly think they intended to, or did abrogate, the common law. In 1641 they passed an act providing that widows should be entitled to their just thirds of the housing and land of their deceased husbands, and in the same statute declared she should not make strip or waste in the land of which she should be endowed ; but they gave no sanction to this law, not even an action for damages. What can be inferred from this, but that the party aggrieved was to have recourse to his remedy at common law, to which same source also he was obliged to resort in order to show what acts would constitute waste ? Upon the supposition, that the common law was not in force then, dowagers, as well as others, were dispunishable of waste, and the heir must take his inheritance just as the incumbents should choose to leave it, without power to prevent waste, or obtain a recompense for it.
The same reasoning applies with equal force to the act of 1701, passed by the provincial legislature, whose power to repeal the common law we also admit, subject to the restrictions of the provincial charter. By this statute the provision for dower was re-affirmed, and the mode of assigning and setting it out was prescribed, differing from the common law in some respects. This statute contained a similar prohibition against waste, and declared that the widow should “be liable to an action for any strip or waste by her done, committed or suffered.” *328 What action P We know not, unless such action or actions as the common law, as before described, had provided.
But the provincial legislature was also silent in regard to waste committed, &c. by other tenants for life, or tenants for years ; so. that unless the common law continued in force, they were still dispunishable. Now if it were admitted, that in regard to tenants in dower, the" colonial or provincial act, or both of them, had repealed the common law and substituted an action on the case for damages only, the case of tenant for life or years, other than in dower, was left untouched, and if they were not amenable on the common law, the enormous consequence would follow, that they might waste and destroy ad libitum, without accountability. The only answer which can be given is, that they who gave them the estates should have provided in the contract against the evil. To this it may be replied, that in many cases, particularly those of confidence, as by will, such provision would not be thought of, and in all cases the law is the better security.
Mr. Dane, in his chapter on waste, is strongly of opinion, that the action does not lie in this Commonwealth, except against tenant in dower by virtue of the statute of 1783. His opinion is entitled to much weight on account of his great learning and experience, so that any who would question hi« positions ought to be well guarded and supported.
He does not call in question the principle, as laid down by those two great lawyers and judges, Dana and Parsons, that the English common law, as altered and amended by statutes at the time of the emigration, was the common law which our ancestors brought with them, but he thinks they silently rejected the statute of Gloucester because of its severity, supposing they adopted the remedial and rejected the penal part of it, or rather, that they adopted by legislation, in the colonial and provincial statutes, the principle of the statute of Marlebridge, which gave an action for damages. Neither the colonial nor provincial statute- expressly gives an action for damages ; the former merely prohibits waste, without suggesting any remedy; the latter gives an action for the strip or waste done, but does not state what shall be the effect of the action.
We do not see our way clear to adopt the inference which *329 this learned author adopts, that an action on the case for waste is thus established as the only remedy; and if it were so in relation to a tenant in dower, we think it does not follow, for the reasons before given, that the doctrine reaches the case of other tenants for life or for years. For aught we know, the relaxation, if it was intended, was owing to a tenderness for the situation of widows, who generally would in those times have but a spare allowance, and who were much more likely to commit waste incautiously, ignorant of the restrictions upon the use of the property, than those to whom life estates would come from other sources.
Neither do we see that one part of the statutes should be called remedial and the other penal, or that the statute of Gloucester is more penal in its character than the statute of Marlebridge. They are both remedial in a high degree in regard to the preservation of estates, and preventing wrong and injustice by a dread of the consequences. A penal statute is one which provides a penalty or mulct for some offence of a public nature. The statute of Gloucester is not of that character. It merely gives effectual remedy for a private injury. The statute of 21 Jac. c. 12, gives double costs to an officer who is sued out of his own county. This is in some sense penal, and yet Chief Justice Dana, in the case of Commonwealth v. Leach, considers it to have been adopted.
But the argument for the defendant in this case has relied much on the provision introduced into our constitution, whereby it is declared, “ that all the laws which have heretofore been adopted, used and approved in the province, colony or State of Massachusetts Bay, and usually practised on in the courts of law, shall still remain and be in full force, until altered or repealed by the legislature ; such parts only excepted as are repugnant to the rights and liberties contained in this constitution.”
It is argued that the law respecting waste, as existing in England at the time of the emigration, was never adopted, used or approved in the province, colony or State, and therefore ceased to be the law after the adoption of the constitution, or rather never had force as law.
The answer to this argument has before been given, viz. that *330 by that article of the constitution the common law was adopted as a whole, and that it is not necessary to show a use or practice of any particular branch of it, to give it validity ; and that it is only of a statute enacted after the emigration that the question can arise, whether it has been actually used in practice, in order to give it the force of law. As an illustration, it may be stated, that many offences have been indicted as such at common law, since the adoption of the constitution, of which probably no example can be produced from the records of the colonial or provincial courts.
So also all the common law remedies for injuries done to property, real or personal, may be considered as legal remedies here, although in former times no case may have arisen which called for the use of any particular one ; unless they are found to be repugnant to the principles of the constitution or inconsistent with the usages and the state and condition of the people, or unless superseded by some direct act of legislation.
And it is upon these grounds that the opinion has so commonly prevailed, that the action of waste, as practised in England at the time of the emigration, is part of our system of remedies, and that we find judges, and even the legislature, admitting by implication the existence of such a remedy.[1]

Nonsuit taken off and new trial granted.

Note. After delivering the foregoing opinion, the Chief Justice suggested, that as the defendant was tenant in fee of half the land described in the writ, it might be questioned whether the plaintiffs could sustain an action of waste, our statute of 1785, c. 62, § 1, having given a different remedy for waste by a tenant in common. See Jackson on Real Actions, 331.

 See Patterson v. Winn, 5 Peters, 241; 1 Baldwin, 559; Colley v. Merrill, 6 Greenleaf, 55; Boynton v. Rees, 9 Pick. 532; Sibley v. Williams, 3 Gill & Johns. 02; State v. Campbell, Charlton, 167.

 See Smith v Follanshee, 13 Maine R. (1 Shepley,) 273; Sackett v. Sackett, 5 Pick. 191; Fay v. Brewer, 3 Pick. (2d. edit.) 205, note 3. Nothing is now recoverable in such case but the place wasted and the amount of damages done to the premises. Revised Stat. c. 105, § 1.